## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **KATHLEEN A. STANCAVAGE,** | : | **Civil No.  1:19-CV-1296** |
| | : | |
| **Plaintiff** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **v.** | : | |
| | : | |
| **ANDREW M. SAUL** | : | |
| **Commissioner of Social Security[1]** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM OPINION

### I.    Introduction

The Supreme Court has recently underscored for us the limited scope of our

review when considering Social Security appeals, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S. Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S. Ct. 1420 (internal quotation marks

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the Commissioner of Social Security, Andrew Saul, is automatically substituted as the defendant in place of the former Acting Commissioner of Social Security. Fed. R. Civ. P. 25(d).

omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Consolidated Edison</u>, 305 U.S. at 229, 59 S. Ct. 206. <u>See</u> <u>Dickinson v. Zurko</u>, 527 U.S. 150, 153, 119 S. Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

<u>Biestek v. Berryhill</u>, 139 S. Ct. 1148, 1154 (2019).

In the instant case, the plaintiff, Kathleen Stancavage applied for disability insurance benefits under Title II of the Social Security Act on October 20, 2016, alleging disability due to severe degenerative arthritis in both knees, plantar fasciitis in both feet, post-traumatic stress disorder (PTSD), degenerative disc disease of the lumbar spine, acid reflux, pain in the legs and feet, and cornea abrasion. (Tr. 151). However, after consideration of the medical records and opinion evidence, including the objective diagnostic tests and clinical findings on Stancavage's physical and mental examinations, Stancavage's longitudinal treatment history, and her documented activities of daily living, the Administrative Law Judge ("ALJ") who reviewed this case concluded that Stancavage could perform a limited range of sedentary work and denied her disability application.

Mindful of the fact that substantial evidence "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" <u>Biestek</u>, 139 S. Ct. at 1154, we find that substantial evidence supported the ALJ's

2

findings in this case. Therefore, for the reasons set forth below, we will affirm the decision of the Commissioner denying this claim.

## II.   <u>Statement of Facts and of the Case</u>

Stancavage is a 41-year-old female who is a veteran of the U.S. Army. (Tr. 72). Stancavage has a high school education and a bachelor's degree and master's degree in social work. (Tr. 73-74). On October 20, 2016, Stancavage applied for disability benefits pursuant to Title II of the Social Security Act. (Tr. 25). In this application, Stancavage alleged that she became disabled beginning July 8, 2009, as a result of severe degenerative arthritis in both knees, plantar fasciitis in both feet, PTSD, degenerative disc disease of the lumbar spine, acid reflux, pain in the legs and feet, and cornea abrasion. (Tr. 238). Stancavage was 30 years old on her alleged onset date of disability. (Tr. 150). Prior to the alleged onset of her disability Stancavage served as a cashier at a convenience store and a petroleum supply specialist in the U.S. Army (combat infantry). (Tr. 85, 229).

The medical record in this case is mixed and equivocal but contains substantial evidence which indicates that Stancavage retained the capacity to perform some work. Stancavage's medical history indicates that her principal concern was her inability to work due to her PTSD. (Tr. 64-92; Doc. 10 p. 1-20). Specifically, Stancavage alleges that she suffers from severe PTSD stemming from her

3

experiences as part of the combat infantry in Iraq and Afghanistan. (Doc. 10 p. 2). To date, the Department of Veterans Affairs has granted 100 percent service connected disability rating to Stancavage based on her PTSD. (Tr. 500, 942). The ALJ concluded, however, that there is no equivalency between the VA rating system and the Social Security Administration's Rules and Regulations governing the determination of disability. (Tr. 33). Further, a VA rating of total and permanent disability is not legally binding on the Commissioner, because the criteria applied by the two agencies are different. (Id.)

On this score, Stancavage's treatment history discloses that in July 8, 2009, claimant's alleged onset date, Stancavage had an outpatient psychotherapy session for PTSD with Dr. Thomas Roedema. (Tr. 32). Stancavage was on her summer break from school, but planned to start her social work internship in the fall and to graduate in December. (Tr. 788). Stancavage planned to continue until she attained her master's degree in social work. (Id.). During her psychotherapy session, Stancavage stated that most of her social contact was with her sister's children. (Id.). Stancavage indicated that she had an increase in PTSD symptoms from fireworks and old military friends contacting her. (Id.). Dr. Roedema reported, however, that Stancavage demonstrated no disturbances of thought processes or thought content;

that her expressive and receptive communication was intact; that she was interpersonally appropriate; and that she did not show any signs of impulsivity. (Id.).

In January 2010, Stancavage saw Dr. Roedema for another outpatient psychotherapy session. (Tr. 32). During the examination, Stancavage admitted to an increase in free time following her graduation from college. (Id.). Stancavage planned to enter a graduate social work program that spring. (Id.). On examination, Stancavage showed no disturbances of thought process or thought content; she had no signs of perceptual disturbances and did not describe any history of the same; her expressive and receptive communication were intact; her mental status findings were the same as her previous psychotherapy appointment; she reported her mood was more anxious and stressed due to back pain, but her affect did not reflect her reported mood. (Id.).

In December 2010, Stancavage met with Dr. Roedema and it was reported that she "seems to be handling things well." (Id.). Stancavage reported that she was completing her schooling, including an internship in social work; she did not feel depressed; and she did not complain of re-experiencing avoidance, or arousal symptoms. (Tr. 797, 889). Stancavage's mood was stable and her affect was within normal limits. (Tr. 797, 889). In March 2011, Stancavage met with Dr. Roedema, however, the conversation primarily concerned Stancavage's relationship issues,

5

and was not related to her PTSD. (Id.). Additionally, on examination, Stancavage revealed normal mental status findings. (Id.).

In May 2012, subsequent to her date last insured, Stancavage had an individual psychotherapy session with Dr. Peter Lielbriedis for treatment for her PTSD. (Id.). The treatment notes revealed that Stancavage was taking amitriptyline, a psychotropic medication used to treat mental and mood problems, such as depression. (Tr. 421). Additionally, the treatment notes indicated that Stancavage was experiencing trust issues, depression, trouble sleeping, tension, pain, difficulty focusing and concentrating, and problems setting boundaries. (Tr. 421). It was also noted that Stancavage was experiencing difficulty dealing with symptoms consistent with PTSD and that she was managing her PTSD mostly by avoidance. (Id.). In terms of her mental status examination, Dr. Lielbriedis noted that Stancavage presented on time and casually, but appropriately dressed; she was alert and verbal; she had good eye contact; her speech was clear with normal volume, pace, and tone; she was oriented to self, others, and surroundings; and her judgement and insight were within normal limits. (Id.). Dr. Lielbriedis also noted a Global Assessment of Functioning (GAF) score of 65.[2]

---

[2] The Global Assessment of Functioning ("GAF"), scores are used to rate the seriousness of a mental illness. They are based on the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (DSM-IV), but are no longer included

In July 2017, Dr. Frank Mrykalo completed a Psychiatric Review Technique Form, indicating that Stancavage had medically determinable impairments of anxiety and obsessive-compulsive disorders, during the relevant period. (Tr. 34). Dr. Mrykalo determined that Stancavage had mild restrictions in understanding, remembering or applying information; mild difficulties interacting with others; moderate difficulties in maintaining concentration, persistence, or pace; and mild difficulties adapting or managing oneself. (Id.).

In July 2017, Dr. Mrykalo also completed a Mental Residual Functional Capacity Assessment. (Tr. 155-56). In the assessment, Dr. Mrykalo concluded that Stancavage was moderately limited in her ability to carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday and workweek without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Id.) Dr. Mrykalo further opined that Stancavage was moderately limited in her ability to interact appropriately with the general public and get along

---

in the most recent publication. It measures how much an individual's symptoms affect his or her daily life on a scale of 0-100. Scores in the range of 60-51 demonstrate moderate symptoms (e.g. flats and circumstantial speech, occasional panic attacks) or moderate difficulty in social occupational, or social functioning (e.g., few friends, conflicts with co-workers).

with co-workers or peers without distracting them of exhibiting behavior extremes. (Id.).

In contrast, in November of 2018, Dr. Holly Kricher, who had counseled Stancavage about tobacco use cessation on several occasions in 2011 and 2012, completed a medical source statement on Stancavage's mental ability to do work-related activities. (Tr. 3639-40). In the statement, Dr. Kricher gave her opinions concerning Stancavage's conditions and limitations as of and prior to December 31, 2011, some seven years earlier. (Tr. 33). Dr. Kricher opined that Stancavage had marked and extreme limitations in her mental abilities to do unskilled and semi-skilled work during the relevant period prior to her date last insured—December 31, 2011. (Id.). Dr. Kricher explained that PTSD causes difficulty managing stress in the workplace and with others. (Id.). She further opined that Stancavage was likely to miss work frequently due to inability to tolerate stress and frustrations, stating that PTSD interferes with ability to concentrate and focus. (Id.).

Stancavage applied for disability insurance benefits on October 20, 2016, and her application for benefits was denied on August 9, 2017. (Tr. 25). Thereafter, Stancavage filed a written request for a hearing on September 7, 2017, and a hearing was held on December 11, 2018. (Id.). At the hearing both Stancavage and a

Vocational Expert testified. (Id.). By a decision dated February 8, 2019, the ALJ denied Stancavage's application for benefits. (Id.).

In that decision, the ALJ first concluded that Stancavage met the insured status requirements of the Social Security Act through December 31, 2011 and had not engaged in any substantial gainful activity since her alleged onset date of disability on July 8, 2009, through her date last insured of December 31, 2011. (Tr. 28). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Stancavage had one severe impairment—PTSD. (Id.). The ALJ concluded that this impairment significantly limited Stancavage's ability to perform basic work activities. (Id.). At Step 3, the ALJ determined that Stancavage did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. (Id.).

Between Steps 3 and 4, the ALJ fashioned a residual functional capacity (RFC), considering Stancavage's limitations from her impairments:

> After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the [RFC] to perform a range of sedentary unskilled work that did not involve detailed instructions. She was confined to routine, repetitive tasks with no assembly line production and no more than occasional contact with the public and co-workers.

(Tr. 31).

Specifically, in making the RFC determination, the ALJ accorded no weight to the Department of Veterans Affairs grant of 100 percent service connected disability rating to Stancavage based on her PTSD. (Tr. 33). The ALJ noted that she considered this rating along with the medical records in reaching the conclusions in this decision. (Id.). The ALJ concluded, however, that there was no equivalency between the VA rating system and the Social Security Administration's Rules and Regulations governing determination of disability. (Id.). Additionally, the ALJ explained that a VA rating of total and permanent disability is not legally binding on the Commissioner, because the criteria applied by the two agencies are different. (Id). The ALJ further explained that the relative weight to be given to this type of evidence will vary, depending upon the factual circumstances of each case. (Id.).

The ALJ gave little weight to Dr. Kricher's opinion. (Tr. 33). Dr. Kricher opined that Stancavage had marked and extreme limitations in her mental abilities to do unskilled and semi-skilled work during the relevant period prior to her date last insured. (Id.). Dr. Kricher explained that PTSD causes difficulty managing stress in the workplace and with others. (Id.). She opined that Stancavage was likely to miss work frequently due to her inability to tolerate stress and frustrations. (Id.). She further indicated that PTSD interferes with an individual's ability to concentrate and focus. (Id.).

10

The ALJ assigned little weight to Dr. Kricher's opinion, concluding that it was inconsistent with the record of treatment during the relevant period and with Stancavage's broad range of activities during the relevant period. (Id.). The ALJ reasoned that Stancavage returned to school and obtained both a bachelor's degree and a master's degree in social work, and that she participated in two internship programs while pursuing her undergraduate degree. (Id.). The ALJ further explained that Stancavage went to the gym three to five times a week; she went to doctor's appointments alone; she became friends with the people at work; she drove 45 minutes to school, attended school and studied at night and on weekends; and she could prepare her own meals, and do her own laundry and light cleaning. (Id.).

Moreover, the ALJ noted that Dr. Kricher saw Stancavage in June 2011, July 2011, and May 2012 for a group therapy session for tobacco use counseling, however, Dr. Kricher's treatment of Stancavage during the relevant period, from her alleged onset date to her date last insured, focused primarily on tobacco use counseling and smoking cessation and not on her PTSD. (Id.). Lastly, the ALJ reasoned that subsequent to Stancavage's date last insured, she had an individual psychotherapy session with Dr. Lielbriedis in 2012 for treatment of her PTSD and her GAF rating was 65. (Id.).

The ALJ accorded great weight to the opinion of Dr. Mrykalo. (Tr. 34). Dr. Mrykalo completed a Psychiatric Review Technique Form, finding that Stancavage had medically determinable impairments of anxiety and obsessive-compulsive disorders during the relevant period. (Tr. 34). Dr. Mrykalo further determined that Stancavage had mild restriction in understanding, remembering or applying information; mild difficulties interacting with others; moderate difficulties in maintaining concentration, persistence, or pace; and mild difficulties adapting or managing oneself. (Id.).

Additionally, Dr. Mrykalo completed a Mental Residual Functional Capacity Assessment, finding that Stancavage was moderately limited in her ability to carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday and workweek without interruption from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods. (Id.) Moreover, Dr. Mrykalo opined that Stancavage was moderately limited in her ability to interact appropriately with the general public and get along with co-workers or peers without distracting them of exhibiting behavior extremes. (Id.).

The ALJ accorded great weight to the opinions of Dr. Mrykalo, on the Psychiatric Review Technique Form and the Mental Residual Functional Capacity

12

Assessment. (Id.). In doing so, the ALJ limited Stancavage to unskilled work that does not involve detailed instructions, and further confined Stancavage to routine, repetitive tasks with no assembly line production and no more than occasional contact with the public and co-workers. (Id.)

Having arrived at this RFC assessment for Stancavage based upon a careful evaluation of these various medical opinions, many of which supported a conclusion that Stancavage could work, the ALJ found at Step 5 that, while Stancavage could not return to her prior occupations, there were other sedentary jobs in the national economy which she could perform. (Tr. 34-35). Accordingly, the ALJ concluded that Stancavage did not meet the stringent standard for disability set by the Act and denied her disability claim. (Id.).

This appeal followed. (Doc. 1). On appeal, Stancavage contends that the ALJ's decision is not based on substantial evidence required under 42 U.S.C. § 405(g) because the ALJ erred in assessing the medical opinion evidence. This case is fully briefed and is, therefore, ripe for resolution. For the reasons set forth, under the deferential standard of review that applies here, the Commissioner's final decision is affirmed.

## III.    Discussion

### A.    Substantial Evidence Review – the Role of this Court

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F. Supp.2d 533, 536 (M.D.Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Pierce v. Underwood, 487 U.S. 552, 565 (1988).  Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. Richardson v. Perales, 402 U.S. 389, 401 (1971).  A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence.  Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).  But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence."  Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966).  "In determining if the Commissioner's decision is

supported by substantial evidence the court must scrutinize the record as a whole."

Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D.Pa. 2003).

The Supreme Court has recently underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that she is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law.  See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D.Pa. Mar. 11, 2014)("[I]t has been held that an ALJ's errors of law denote

15

a lack of substantial evidence.")(alterations omitted); Burton v. Schweiker, 512 F.

Supp. 913, 914 (W.D.Pa. 1981)("The Secretary's determination as to the status of a

claim requires the correct application of the law to the facts."); see also Wright v.

Sullivan, 900 F.2d 675, 678 (3d Cir. 1990)(noting that the scope of review on legal

matters is plenary); Ficca, 901 F. Supp.2d at 536 ("[T]he court has plenary review

of all legal issues . . . .").

Several fundamental legal propositions which flow from this deferential

standard of review. First, when conducting this review "we are mindful that we must

not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777

F.3d 607, 611 (3d Cir. 2014) (citing Rutherford, 399 F.3d at 552). Thus, we are

enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply

determine whether substantial evidence supported the ALJ's findings. However, we

must also ascertain whether the ALJ's decision meets the burden of articulation

demanded by the courts to enable informed judicial review. Simply put, "this Court

requires the ALJ to set forth the reasons for his decision." Burnett v. Comm'r of Soc.

Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted

on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for
> his decision. 220 F.3d at 119. Conclusory statements . . . are
> insufficient. The ALJ must provide a "discussion of the evidence" and
> an "explanation of reasoning" for his conclusion sufficient to enable

meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

## B.    Initial Burdens of Proof, Persuasion, and Articulation for the ALJ

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); see also 20 C.F.R. §§404.1505(a), 416.905(a).  To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy.  42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a).  To receive benefits under

17

Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured.  42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process.   20 C.F.R.  §§404.1520(a), 416.920(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment;  (3)  whether  the  claimant's  impairment  meets  or  equals  a  listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC").   20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC).  RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)."  Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e),  404.1545(a)(1),  416.920(e),  416.945(a)(1).    In  making  this assessment,  the  ALJ  considers  all  of  the  claimant's  medically  determinable

18

impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §§404.1545(a)(2), 416.945(a)(2).

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and have suggested that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013) (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that: "There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a

physician is misguided." <u>Cummings v. Colvin</u>, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where a well-supported medical source has opined regarding limitations which would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. <u>See Titterington v. Barnhart,</u> 174 F. App'x 6, 11 (3d Cir. 2006); <u>Cummings v. Colvin</u>, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015). In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if

it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §§404.1512(f), 416.912(f); Mason, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence

standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." <u>Cotter v. Harris</u>, 642 F.2d 700, 704 (3d Cir. 1981).  Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence.  <u>Id</u>. at 706-707.  In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding."  <u>Schaudeck v. Comm'r of Soc. Sec.</u>, 181 F. 3d 429, 433 (3d Cir. 1999).

### C.   <u>Legal Benchmarks for the ALJ's Assessment of Medical Opinion and Lay Evidence</u>

The Commissioner's regulations also set standards for the evaluation of medical evidence, and define medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [a claimant's] symptoms, diagnosis and prognosis, what [a claimant] can still do despite impairments(s), and [a claimant's] physical or mental restrictions." 20 C.F.R. §404.1527(a)(2). Regardless of its source, the ALJ is required to evaluate every medical opinion received. 20 C.F.R. §404.1527(c).

In deciding what weight to accord to competing medical opinions and evidence, the ALJ is guided by factors outlined in 20 C.F.R. §404.1527(c). "The

regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." SSR 96-6p, 1996 WL 374180 at *2. Treating sources have the closest ties to the claimant, and therefore their opinions are generally entitled to more weight. See 20 C.F.R. §404.1527(c)(2)("Generally, we give more weight to opinions from your treating sources..."); 20 C.F.R. §404.1502 (defining treating source). Under some circumstances, the medical opinion of a treating source may even be entitled to controlling weight. 20 C.F.R. §§04.1527(c)(2); see also SSR 96-2p, 1996 WL 374188 (explaining that controlling weight may be given to a treating source's medical opinion only where it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and it is not inconsistent with the other substantial evidence in the case record).

Where no medical source opinion is entitled to controlling weight, the Commissioner's regulations direct the ALJ to consider the following factors, where applicable, in deciding the weight given to any non-controlling medical opinions: length of the treatment relationship and frequency of examination; nature and extent of the treatment relationship; the extent to which the source presented relevant evidence to support his or her medical opinion, and the extent to which the basis for the source's conclusions were explained; the extent to which the source's opinion is

consistent with the record as a whole; whether the source is a specialist; and, any other factors brought to the ALJ's attention. 20 C.F.R. §404.1527(c).

At the initial level of administrative review, State agency medical and psychological consultants may act as adjudicators. See SSR 96-5p, 1996 WL 374183 at *4. As such, they do not express opinions; they make findings of fact that become part of the determination. Id. However, 20 C.F.R. §404.1527(e) provides that at the ALJ and Appeals Council levels of the administrative review process, findings by nonexamining State agency medical and psychological consultants should be evaluated as medical opinion evidence. Therefore, ALJs must consider these opinions as expert opinion evidence by nonexamining physicians and must address these opinions in their decisions. SSR 96-5p, 1996 WL 374183 at *6. Opinions by State agency consultants can be given weight "only insofar as they are supported by evidence in the case record." SSR 96-6p, 1996 WL 374180 at *2. In appropriate circumstances, opinions from nonexamining State agency medical consultants may be entitled to greater weight than the opinions of treating or examining sources. Id. at *3.

Oftentimes, as in this case, an ALJ must evaluate medical opinions and records tendered by both treating and non-treating sources. Judicial review of this aspect of ALJ decision-making is guided by several settled legal tenets. First, when

presented with a disputed factual record, it is well-established that "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011). Thus, "[w]here, . . . , the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (quoting Mason, 994 F.2d at 1066). Therefore, provided that the decision is accompanied by an adequate, articulated rationale, it is the province and the duty of the ALJ to choose which medical opinions and evidence deserve greater weight.

Further, in making this assessment of medical evidence:

> An ALJ is [also] entitled generally to credit parts of an opinion without crediting the entire opinion. See Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015); Turner v. Colvin, 964 F. Supp. 2d 21, 29 (D.D.C. 2013) (agreeing that "SSR 96–2p does not prohibit the ALJ from crediting some parts of a treating source's opinion and rejecting other portions"); Connors v. Astrue, No. 10–CV–197–PB, 2011 WL 2359055, at *9 (D.N.H. June 10, 2011). It follows that an ALJ can give partial credit to all medical opinions and can formulate an RFC based on different parts from the different medical opinions. See e.g., Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015).

Durden v. Colvin, 191 F.Supp.3d 429, 455 (M.D. Pa. 2016).

Similar considerations govern an ALJ's evaluation of lay testimony. When evaluating lay testimony regarding a claimant's reported degree of disability, we are reminded that:

> [T]he ALJ must necessarily make certain credibility determinations, and this Court defers to the ALJ's assessment of credibility. See Diaz v. Comm'r, 577 F.3d 500, 506 (3d Cir. 2009) ("In determining whether there is substantial evidence to support an administrative law judge's decision, we owe deference to his evaluation of the evidence [and] assessment of the credibility of witnesses...."). However, the ALJ must specifically identify and explain what evidence he found not credible and why he found it not credible. Adorno v. Shalala, 40 F.3d 43, 48 (3d Cir. 1994) (citing Stewart v. Sec'y of Health, Education and Welfare, 714 F.2d 287, 290 (3d Cir. 1983)); see also Stout v. Comm'r, 454 F.3d 1050, 1054 (9th Cir. 2006) (stating that an ALJ is required to provide "specific reasons for rejecting lay testimony"). An ALJ cannot reject evidence for an incorrect or unsupported reason. Ray v. Astrue, 649 F.Supp.2d 391, 402 (E.D. Pa. 2009) (quoting Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir. 1993)).

Zirnsak v. Colvin, 777 F.3d 607, 612–13 (3d Cir. 2014).

Yet, it is also clear that:

> Great weight is given to a claimant's subjective testimony only when it is supported by competent medical evidence. Dobrowolsky v. Califano, 606 F.2d 403, 409 (3d Cir. 1979); accord Snedeker v. Comm'r of Soc. Sec., 244 Fed.Appx. 470, 474 (3d Cir. 2007). An ALJ may reject a claimant's subjective testimony that is not found credible so long as there is an explanation for the rejection of the testimony. Social Security Ruling ("SSR") 96–7p; Schaudeck v. Comm'r of Social Security, 181 F.3d 429, 433 (3d Cir. 1999). Where an ALJ finds that there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the individual's pain or other symptoms, however, the severity of which is not substantiated by objective medical evidence, the ALJ must make a

finding on the credibility of the individual's statements based on a consideration of the entire case record.

McKean v. Colvin, 150 F.Supp.3d 406, 415–16 (M.D. Pa. 2015) (footnotes omitted). Thus, we are instructed to review an ALJ's evaluation of a claimant's subjective reports of pain under a standard of review which is deferential with respect to the ALJ's well-articulated findings but imposes a duty of clear articulation upon the ALJ so that we may conduct meaningful review of the ALJ's conclusions.

In the same fashion that medical opinion evidence is evaluated, the Social Security Rulings and Regulations provide a framework under which the severity of a claimant's reported symptoms are to be considered. 20 C.F.R. §§ 404.1529, 416.929; SSR 16–3p. It is important to note that though the "statements of the individual concerning his or her symptoms must be carefully considered, the ALJ is not required to credit them." Chandler, 667 F.3d at 363 (referencing 20 C.F.R. §404.1529(a) ("statements about your pain or other symptoms will not alone establish that you are disabled."). It is well-settled in the Third Circuit that "[a]llegations of pain and other subjective symptoms must be supported by objective medical evidence." Hantraft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999) (referring to 20 C.F.R. § 404.1529). When evaluating a claimant's symptoms, the ALJ must follow a two-step process in which the ALJ resolves whether a medically

determinable impairment could be the cause of the symptoms alleged by the claimant, and subsequently must evaluate the alleged symptoms in consideration of the record as a whole. SSR 16-3p.

First, symptoms, such as pain or fatigue, will only be considered to affect a claimant's ability to perform work activities if such symptoms result from an underlying physical or mental impairment that has been demonstrated to exist by medical signs or laboratory findings. 20 C.F.R. §§ 404.1529(b), 416.929(b); SSR 16–3p. During the second step of this credibility assessment, the ALJ must determine whether the claimant's statements about the intensity, persistence or functionally limiting effects of his or her symptoms are substantiated based on the ALJ's evaluation of the entire case record. 20 C.F.R. § 404.1529(c), 416.929(c); SSR 16–3p. This includes but is not limited to: medical signs and laboratory findings, diagnosis and other medical opinions provided by treating or examining sources, and other medical sources, as well as information concerning the claimant's symptoms and how they affect his or her ability to work. Id. The Social Security Administration has recognized that individuals may experience their symptoms differently and may be limited by their symptoms to a greater or lesser extent than other individuals with the same medical impairments, signs, and laboratory findings. SSR 16–3p.

Thus, to assist in the evaluation of a claimant's subjective symptoms, the Social Security Regulations identify seven factors which may be relevant to the assessment of the severity or limiting effects of a claimant's impairment based on a claimant's symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). These factors include: activities of daily living; the location, duration, frequency, and intensity of the claimant's symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate his or her symptoms; treatment, other than medication that a claimant has received for relief; any measures the claimant has used to relieve his or her symptoms; and, any other factors concerning the claimant's functional limitations and restrictions. Id.; see George v. Colvin, No. 4:13–CV–2803, 2014 WL 5449706, at *4 (M.D. Pa. Oct. 24, 2014); Koppenaver v. Berryhill, No. 3:18-CV-1525, 2019 WL 1995999, at *9 (M.D. Pa. Apr. 8, 2019), report and recommendation adopted sub nom. Koppenhaver v. Berryhill, No. 3:18-CV-1525, 2019 WL 1992130 (M.D. Pa. May 6, 2019); Martinez v. Colvin, No. 3:14-CV-1090, 2015 WL 5781202, at *8–9 (M.D. Pa. Sept. 30, 2015).

29

### D.    The ALJ's Decision in this Case is Supported by Substantial Evidence.

In this setting, we are mindful that we are not free to substitute our independent assessment of the evidence for the ALJ's determinations. Rather, we must simply ascertain whether the ALJ's decision is supported by substantial evidence, a quantum of proof which is less than a preponderance of the evidence but more than a mere scintilla, Richardson v. Perales, 402 U.S. 389, 401 (1971), and "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988). Judged against these deferential standards of review, we find that substantial evidence supported the decision by the ALJ that Stancavage could perform a limited range of sedentary work and was not disabled.

### 1.    The ALJ's Step Two Evaluation is Supported by Substantial Evidence and Any Alleged Error is Harmless on These Facts

Stancavage's first claim of error challenges the ALJ's step two evaluation. (Doc. 16 p. 1). Specifically, Plaintiff argues that the ALJ concluded that she suffered from the severe impairment of PTSD, but failed to find that her lumber degenerative disc disease status-post surgery and degenerative joint disease of the right knee with bilateral patellofemoral syndrome were severe impairments. (Id.) Stancavage

30

contends that this error is harmful because having deemed these impairments to cause no significant limitations, the ALJ overestimated her RFC. (Doc. P. 7). Thus, the ALJ's decision should be reversed. (Id.).

In response, the Commissioner argues that Stancavage failed to meet her burden of showing that her lumbar degenerative disc disease and osteoarthritis of the knees qualified as severe impairments. (Doc. 15 p. 7). The Commissioner contends that given the record evidence, there is no support for a finding that Stancavage's lumbar degenerative disc disease and osteoarthritis of the knees significantly impacted her performance of basic work activities. (Id.). Moreover, the Commissioner avers that because the ALJ did not end the step two inquiry and went on to consider all of Stancavage's credibly established limitations, her step two argument should be dismissed. (Id.).

At step-two of the sequential analysis, the ALJ determines whether a claimant has a medically severe impairment or combination of impairments. Bowen v. Yuckert, 482 U.S. 137, 140-41 (1987). An impairment is considered severe if it "significantly limits an individual's physical or mental abilities to do basic work activities. 20 C.F.R. 404.1520(c). An impairment is severe if it is "something beyond a 'slight abnormality which would have no more than a minimal effect on the Plaintiff's ability to do basic work activities. McCrea v. Comm'r of Soc. Sec., 370

F.3d at 357, 360 (3d Cir. 2004) (quoting SSR 85-28, 1985 WL 56856 (1985)). The Court of Appeals is clear that the step-two inquiry is a de minimis screening device used to cast out meritless claims. McCrea, 370 F.3d at 360; Newell v. Comm'r of Soc. Sec., 347 F.3d 541, 546 (3d Cir. 2003). The burden is on the claimant to show that an impairment qualifies as severe. Bowen, 482 U.S. at 146.

Applying the above standard, we find that the ALJ's step two evaluation is supported by substantial evidence. At step two, the ALJ considered all of Stancavage's alleged impairments, including her lumbar degenerative disc disease status post-surgery, degenerative joint disease of the right knee with bilateral patellofemoral syndrome, and PTSD. (Tr. 28-31). The ALJ, however, concluded that through the date last insured, Stancavage had one severe impairment—PTSD. (Tr. 28). The ALJ then went on to conclude that Stancavage had nonsevere impairments of degenerative disc disease status post-surgery, degenerative joint disease of the right knee and bilateral patellofemoral syndrome. (Id.). In forming this determination, the ALJ considered Stancavage's treatment records and testimony concerning her activities of daily living, which demonstrated that these impairments did not result in more than a minimal impact on Stancavage's ability to perform some work-related activities. (Tr. 28).

The ALJ explained, that with regard to Stancavage's lumbar spine degenerative disc disease status post-surgery, Stancavage had underwent an L5-S1 anterior lumbar fusion in April 2010 and x-rays of her lumbosacral spine showed no evidence of hardware failure after her anterior lumbar fusion L5-S1. (Tr. 30). The ALJ noted that Stancavage's EMG was negative for lumbosacral radiculopathy and her neurological examination was intact and unchanged from pre-operative and post-operative exams. (Id.). Additionally, the ALJ explained that Stancavage's physical examinations demonstrated some tenderness, but overall exhibited normal findings, including good range of motion, normal reflexes, negative straight leg raise, no swelling, and no instability. (Tr. 31). Further, the ALJ noted that Stancavage's x-rays of her lumbar spine showed no significant interval changes and only mild degenerative disc disease at L4-5, no substantial canal stenosis, epidural fibrosis or other thecal sac pathology; only mild lumbar spondylosis status post anterior fusion at L5-S1; and no thecal sac compression. (Tr. 30).

With regard to Stancavage's degenerative joint disease of the right knee and bilateral patellofemoral syndrome, the ALJ explained that although Stancavage complained of bilateral knee pain, her examinations revealed limited abnormal findings. For example, Stancavage exhibited some crepitance in the right knee with no effusion; the left knee had a mild patella sign, but no effusion or crepitance; and

33

she wore knee braces and had a mild antalgic limp. (Tr. 30). Further, the ALJ explained that Stancavage's right and left knee x-rays showed only moderate degenerative changes. (Id.). Additionally, the ALJ noted that Stancavage's physical examinations revealed good range of motion, slight crepitus and tenderness, no swelling, and no instability. (Tr. 31). The ALJ further cited Stancavage's conservative treatment as a basis for her decision, explaining that Stancavage received medication management and periodic injections for her knees to manage her pain. (Id.).

The ALJ concluded that Stancavage's impairments of lumbar spine degenerative disc disease status post-surgery and degenerative joint disease of the right knee and bilateral patellofemoral syndrome were nonsevere impairments in light of the contrasting medical evidence and findings, but also given other record evidence. For example, the ALJ found that no treating source of record had opined any physical limitations for Stancavage. (Tr. 30). Further, at her hearing, Stancavage testified primarily about her mental health limitations. (Id.). Additionally, Stancavage indicated that during the relevant period, she was working out at the gym three to five times a week. (Id.)

In any event it is evident that the ALJ considered these impairments throughout the sequential evaluation process and incorporated them into the

sedentary RFC, which placed very limited exertional demands upon Stancavage. This continued consideration of Stancavage's physical impairments is fatal to this Step 2 argument since it is well-settled that: "[E]ven if an ALJ erroneously determines at step two that one impairment is not 'severe,' the ALJ's ultimate decision may still be based on substantial evidence if the ALJ considered the effects of that impairment at steps three through five." <u>Naomi Rodriguez v. Berryhill</u>, No. 1:18-CV-684, 2019 WL 2296582, at *10 (M.D. Pa. May 30, 2019)(citing cases). In this case, contrary to Stancavage's contentions, the ALJ considered her physical impairments at step two of the sequential evaluation process, and continued to consider them throughout this process in crafting the sedentary RFC for the plaintiff. Therefore, we find no basis for disturbing the ALJ's determination as to this issue.

### 2. <u>Substantial Evidence Supports the ALJ's Assignment of "Little" Weight to the opinion of Dr. Kricher</u>

Next, Stancavage argues that the ALJ erred in assigning "little" weight to the opinion of Dr. Kricher, a treating psychologist. (Doc. 10 p. 7-14). Stancavage asserts that had Dr. Kricher's opinion been credited, the ALJ would have been compelled to render a finding of disabled. (Doc. 10 p. 10). Stancavage further contends that the ALJ's rationale for assigning "little" weight to Dr. Kricher's opinion was erroneous. (<u>Id</u>.). Specifically, Stancavage asserts:

> [The] ALJ assigned Dr. Kricher's opinion "little weight" based on her
> view that "it is not consistent with either the record of treatment during
> the relevant period, nor with claimant's broad range of activities during
> the relevant period" (R. 33). The ALJ's reasoning was erroneous.

(Doc. 10 p. 10-11). Stancavage argues that the ALJ's reasoning that Dr. Kricher's

opinion is inconsistent with her treatment records is belied by the record evidence,

as Dr. Kricher's findings are confirmed by the treatment records. (Doc. 10 p. 11).

Stancavage avers that in failing to credit Dr. Kricher's opinion, the ALJ substituted

her own lay opinion about the treatment record for the expert judgment of Dr.

Kricher. (Doc. 10 p. 12). Stancavage further argues that the ALJ's reliance on her

activities of daily living is misplaced. (Doc. 10 p. 13). Stancavage contends that her

ability to engage in some sporadic activities for brief periods of time at her own

discretion is not dispositive of what she could do in a competitive work environment.

(Id.).

> In response, the Commissioner argues:

> An ALJ must consider medical opinions by acceptable medical sources
> in evaluating a claimant's RFC, [however] an ALJ is not bound by the
> finding of a treating physician if: (1) they are not well-supported by
> medically acceptable clinical and laboratory diagnostic techniques, or
> (2) they are inconsistent with other substantial evidence of record.

(Doc. 15 p. 10). In the present case, the Commissioner argues that the ALJ

adequately explained her rationale in according Dr. Kricher's opinion "little" weight.

(Doc. 15 p. 10-11). Thus, the ALJ's assessment on this matter complied with the dictates of the law. (Doc. 15 p. 11).

The Court of Appeals has ruled that the ALJ—not treating or examining physicians or State agency consultants—must make the ultimate disability and RFC determinations. Chandler, 667 F.3d at 361. The ALJ is charged with a duty to evaluate all the medical opinions in the record under the factors set forth in the regulations and to resolve any conflicts. 20 C.F.R. § 404.1527. An ALJ may give an opinion less weight or no weight if it does not present relevant evidence or a sufficient explanation to support it, or if it is inconsistent with the record as a whole. 20 C.F.R. § 404.1527(c). The ALJ may choose which medical evidence to credit and which to reject as long as there is a rational basis for the decision. Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999).

Here, the Court finds that substantial evidence supports the ALJ's assignment of "little" weight to the opinion of Dr. Kricher. In the present case, the ALJ considered the opinion of Dr. Kricher, a treating phycologist, and accorded her opinion "little" weight. (Tr. 33). The ALJ reasoned that Dr. Kricher's opinion, which was rendered long after the fact, was inconsistent with the record of treatment during the relevant period and Stancavage's broad range of activities during the relevant period. (Id.). The ALJ explained that the record evidence demonstrated that

37

Stancavage returned to school and obtained both her bachelor's degree and master's degree in social work, and she participated in two internship programs while pursuing her undergraduate degree. (Id.). Additionally, she reasoned that the record revealed that Stancavage went to the gym three to five times of a week; and she went to doctor's appointments alone. (Id.). The ALJ further explained that Stancavage testified that she became friends with the people at work; she drove 45 minutes to school, attended school and studied at night and on the weekends; and she could prepare her own meals, and do her laundry and light cleaning. (Id.).

In sum, the ALJ was confronted by a record marked by contrasting medical opinions and inconsistencies in Stancavage's abilities and limitations. In reconciling the discordant and conflicting threads of this evidence, the ALJ assigned "little" weight to the opinion of Dr. Kricher, finding that Dr. Kricher's opinion was inconsistent with the overall medical record and her broad range of daily activities. It is the right and responsibility of the ALJ to make such assessments and we find that substantial evidence supported the ALJ's decision. It appears that Stancavage is requesting that this Court re-weigh the evidence. This we may not do. See, e.g., Rutherford, 399 F.3d at 552 ("In the process of reviewing the record for substantial evidence, we may not 'weigh the evidence or substitute our own conclusions for those of the fact-finder.'" (quoting Williams v. Sullivan, 970 F.2d 1178, 1182 (3d

38

Cir. 1992))).  Because we cannot re-weigh the evidence, and because we find that

the ALJ properly articulated that substantial evidence did not support lending greater

weight to this medical opinion, we find the ALJ has not erred in assigning "little"

weight to the opinion of Dr. Kricher.

**3.** **Substantial Evidence Supports the ALJ's Assignment of "Little" Weight to the VA Finding of 100 Percent Service Connected Disability for PTSD**

Stancavage's next claim of error challenges the ALJ's assignment of "little"

weight to the VA finding of 100 percent service connected disability for PTSD.

(Doc. 10 p. 14-16). Specifically, Stancavage argues:

> In the instant case, the VA has found Ms. Stancavage disabled with a 100 percent service connected disability rating for her PTSD (R. 33, 72). The ALJ stated that she "considered this rating," but also stated that "[t]here is no equivalency between the VA rating system" and Social Security regulations, and that "[a] VA rating of total and permanent disability is not binding on the Commissioner, because the criteria applied by the two agencies are different" (R. 33). The ALJ concluded that "[t]he relative weight to be given to this type of evidence will vary, depending on the factual circumstances of each case" (R. 33). However, the ALJ never stated what weight she assigned to this evidence, if any.

(Doc. 10 p. 15-16). Stancavage argues that the ALJ provided no explanation as to

how the disability finding by the VA is not probative with regard to her disability

claim. (Doc. 10 p. 16). Therefore, because the ALJ failed to assign significant weight

to the VA disability rating and failed to provide an adequate explanation, her decision should be reversed. (Id.).

In response, the Commissioner argues that the ALJ considered the VA determination of 100 percent disability due to Stancavage's PTSD. (Doc. 15 p. 12). The ALJ, however, noted that there was no equivalent between the VA rating system and the agency regulations. (Id.). The Commissioner further contends that the ALJ adequately explained the legal and factual basis for her determination, citing Stancavage's minimal treatment and extensive activities as a reason for affording "little" weight to the VA's disability determination. (Id.). Thus, the ALJ's assessment on this matter complied with the dictates of the law. (Id.).

The VA disability rating process is substantively different from the Social Security Disability determinations. Durden v. Colvin, 191 F. Supp. 3d 429, 444 (M.D. Pa. 2016); McCleary v. Colvin, 187 F. Supp 3d 497, 542 (M.D. Pa. 2016); Bowyer v. Brown, 7 Vet.App. 549, 552 (1995) (recognizing that "there are significant differences in the definition of disability under the Social Security and VA systems"). For example, the Department of Veteran's Affairs requires less proof of disability than the Social Security Administration; service-connected disability compensation is different from the benefits obtainable under the Social Security Act; there are substantive differences between VA disability and Social Security

disability regarding the amount of money an individual can still earn and be considered disabled; and there are differences in the VA's approach to determining entitlement to individual unemployability. <u>Durden</u>, 191 F. Supp. 3d at 444-48; <u>Jenkins v. Astrue</u>, No. 1:11-CV-23-MP-GRJ, 2012 WL 807487, at 10-11 (N.D. Fl Feb. 8, 2012).

While disability determinations from other government agencies are not binding, they must be considered. <u>McCleary v. Colvin</u>, 187 F. Supp. 3d 497, 542 (M.D. Pa. 2016); 20 C.F.R. §§ 404.1504, 416.904. To "consider" means to provide explanation sufficient for a "subsequent reviewer to follow the adjudicator's reasoning." <u>McCleary</u>, 187 F. Supp. 3d at 542. Courts have ruled that an ALJ commits no error in finding that the VA's determination of "total disability" should be accorded less weight based on the "substantial differences in the criteria used by the VA in making disability evaluations compared to the disability decisions under the Social Security Act. <u>Jenkins v. Astrue</u>, No. 1:11-CV-23-MP-GRJ, 2012 WL 807487, at 10-11 (N.D. Fl Feb. 8, 2012); <u>Barnett v. Astrue</u>, No. 3:10–CV–1316, 2012 WL 75046, at *15–18 (S.D.W.Va. Jan. 10, 2012) (affirming ALJ decision giving "little weight" to VA rating); <u>Hacia v. Comm'r of Soc. Sec.</u>,601 Fed.Appx. 783, 785–86 (11th Cir. 2015) (finding no requirement that an ALJ must make detailed findings in support of his conclusion that the relative disability standards

41

differ where "the ALJ's decision reflects that he considered both standards, determined that the DOD's disability standard was lower than that of the Commissioner, and thus assigned limited weight to the DOD's determination").

Additionally, circuit courts have held that attributing "great" weight to a disability determination of the VA "disregards the substantial difference between the criteria used in the [VA and the SSA] programs." Durden, 191 F. Supp. 3d at 444; Allord v. Barnhart, 455 F.3d 818, 820 (7th Cir. 2006). Further, even in circuits which hold that other agency disability determinations are entitled to "great weight," courts still give varying weight to such determinations, "depending upon the factual circumstances of each case." Durden, 191 F. Supp. 3d at 444; Chambliss v. Massanari, 269 F.3d 520, 522 (5th Cir.2001); Fitzgerald v. Astrue, No. 2:08-CV-170, 2009 WL 4571762, at *7 (D.Vt. Nov. 30, 2009).

Applying the above standard, the Court finds that the ALJ's consideration of Stancavage's 100 percent VA disability rating is supported by substantial evidence. Here, the ALJ considered the Department of Veterans Affairs grant of 100 percent service connected disability rating to Stancavage based on her PTSD along with the entire medical record. (Tr. 33). The ALJ noted, however, that there was no equivalency between the VA rating system and the Social Security Administration's Rules and Regulations governing determination of disability. (Id.). The ALJ further

explained that a VA rating of total and permanent disability is not legally binding on the Commissioner, because the criteria applied by the two agencies are different. (Id.). Additionally, consistent to case law, the ALJ concluded that the relative weight to be accorded to this type of evidence will vary, depending upon the factual circumstances of each case. (Id.). Thus, contrary to Stancavage's contentions, the ALJ considered her VA 100 percent rating of total and permanent disability. Stancavage argues that the ALJ assigned no weight to the VA's disability determination and provided no explanation as to how the disability finding by the VA is not probative with respect to her claim. (Doc. 10 p. 16). However, as stated supra, courts have ruled that an ALJ commits no error in finding that the VA's determination of "total disability" should be accorded less weight based on the "substantial differences in the criteria used by the VA in making disability evaluations compared to the disability decisions under the Social Security Act. Jenkins v. Astrue, No. 1:11-CV-23-MP-GRJ, 2012 WL 807487, at 10-11 (N.D. Fl Feb. 8, 2012); Barnett v. Astrue, No. 3:10–CV–1316, 2012 WL 75046, at *15–18 (S.D.W.Va. Jan. 10, 2012) (affirming ALJ decision giving "little weight" to VA rating); Hacia v. Comm'r of Soc. Sec.,601 Fed.Appx. 783, 785–86 (11th Cir. 2015) (finding no requirement that an ALJ must make detailed findings in support of his conclusion that the relative disability standards differ where "the ALJ's

decision reflects that he considered both standards, determined that the DOD's disability standard was lower than that of the Commissioner, and thus assigned limited weight to the DOD's determination").

Therefore, because the ALJ's assessment on this matter complied with the dictates of the law, we find that the ALJ's determination as to his issue is supported by substantial evidence and may not be disturbed on appeal.

**4.** <u>**Substantial Evidence Supports the ALJ's Evaluation of Stancavage's symptom allegations**</u>

Next, Stancavage argues that the ALJ failed to properly address her statements regarding her impairments. (Doc. 10 p. 16). Specifically, Stancavage asserts:

> The ALJ found that Ms. Stancavage's "medically determinable impairments could reasonably be expected to cause the alleged symptoms" but found her statements concerning the intensity, persistence, and limiting effects of her symptoms "while generally accepted, do not demonstrate work preclusive limitations during the relevant period for the reasons explained in this decision" (R. 32) (emphasis added).  The ALJ then provided a summary of some of the evidence in the record, but never provided the promised "reasons explained in [the] decision" that explained why the claimant's allegations were not work preclusive.

(Doc. 10 p. 16-17). Stancavage avers that in assessing a claimant's subjective complaints, 20 C.F.R. § 404.1529 provides that an ALJ must consider the seven enumerated factors and explain what evidence is relevant to those factors when a claimant's allegations are not accepted. (Doc. 10 p. 17). In the present case, however,

44

Stancavage insists that the ALJ provided no explanation. (Id.). Thus, in Stancavage's view the ALJ's decision should be reversed. (Id.).

We disagree. To be sure an ALJ must consider all of a claimant's symptoms in determining whether the claimant is disabled, including the claimant's pain. 20 C.F.R. § 404.1529(a). Statements about a claimant's pain, however, are not by themselves sufficient to establish that the claimant is disabled. (Id.). To establish disability, there must be objective medical evidence from an acceptable medical source showing that the claimant has a medical impairment which could reasonably be expected to produce the pain or other symptoms alleged and that leads to the conclusion that the claimant is disabled when considered with the other evidence of record. (Id.).

As mentioned supra, an ALJ must conduct a two-step process in analyzing a claimant's pain or other symptoms. First, the ALJ must determine whether the claimant has "a medically determinable impairment that could reasonably be expected to produce [the claimant's] symptoms, such as pain." 20 C.F.R. § 404.1529(b). Second, when the record shows that the claimant has a "medically determinable impairment(s) that could reasonably be expected to produce [the claimant's] symptoms," the ALJ "must then evaluate the intensity and persistence of [the claimant's] symptoms" to determine how the symptoms limit the claimant's

capacity for work. 20 C.F.R. § 404.1529(c)(1). "In evaluating the intensity and persistence" of a claimant's symptoms, the ALJ considers "all of the available evidence" from "medical sources and nonmedical sources" to determine how the symptoms affect the claimant. (Id.).

Despite Stancavage's contentions, the Court finds that the ALJ properly evaluated her symptom allegations. In this case, the ALJ considered all of Stancavage's medically determinable impairments in determining whether Stancavage was disabled, including her PTSD, lumbar spine degenerative disc disease status post-surgery, and degenerative joint disease of the right knee and bilateral patellofemoral syndrome. (Tr. 28). The ALJ, however, found that while Stancavage's medically determinable impairments could reasonable be expected to cause her pain and other symptoms, they did not demonstrate work preclusive limitations during the relevant period. (Tr. 32).

With regard to Stancavage's PTSD, the ALJ considered and weighed the opinion evidence of record, including the opinions of Dr. Roedema, Dr. Kricher, and Dr. Mrykalo. (Tr. 31-34). However, the ALJ noted some internal inconsistencies with Stancavage's record of treatment and her broad range of activities, as Stancavage described her daily activities in terms that were not wholly disabling. For example, during the relevant period, Stancavage returned to school and obtained

both her bachelor's degree and master's degree in social work; she participated in two internship programs, while pursuing her undergraduate degree; she went to the gym three to five times a week with her brother-in-law; she went to doctor's appointments unaccompanied; and she became friends with the people at work. (Tr. 33). The ALJ further noted that Stancavage drove 45 minutes school; she attended school and studied at night and the weekends; she could prepare her own meals; and she could complete household chores, such as laundry and light cleaning. (Id.). In addition to Stancavage's broad range of activities, the ALJ explained that the overall findings revealed that Stancavage presented with stable mental status examinations, including no signs of perceptual disturbances and thought processes, her affect was within normal limits, her expressive and receptive communication was intact, she showed no signs of impulsivity, and indicated appropriate activities of daily living. (Tr. 31-34).

Additionally, with regard to Stancavage's physical impairments, the ALJ explained that Stancavage's lumbar spine degenerative disc disease status post-surgery, Stancavage had underwent an L5-S1 anterior lumbar fusion in April 2010 and x-rays of her lumbosacral spine showed no evidence of hardware failure after her anterior lumbar fusion L5-S1. (Tr. 30). Further, the ALJ noted that Stancavage's EMG was negative for lumbosacral radiculopathy and her neurological examination

was intact and unchanged from pre-operative and post-operative exams. (Id.).
Moreover, the ALJ explained that Stancavage's physical examinations demonstrated
some tenderness, but overall exhibited normal findings, including good range of
motion, normal reflexes, negative straight leg raise, no swelling, and no instability.
(Tr. 31). Finally, the ALJ noted that Stancavage's x-rays of her lumbar spine showed
no significant interval changes and only mild degenerative disc disease at L4-5, no
substantial canal stenosis, epidural fibrosis or other thecal sac pathology; only mild
lumbar spondylosis status post anterior fusion at L5-S1; and no thecal sac
compression. (Tr. 30).

With respect to Stancavage's degenerative joint disease of the right knee and
bilateral patellofemoral syndrome, the ALJ explained that although Stancavage
complained of bilateral knee pain, her examinations revealed limited abnormal
findings. For example, Stancavage exhibited some crepitance in the right knee with
no effusion; the left knee had a mild patella sign, but no effusion or crepitance; and
she wore knee braces and had a mild antalgic limp. (Tr. 30). Further, the ALJ
explained that Stancavage's right knee x-rays and an MRI showed moderate
degenerative changes and an MRI of the left knee also only showed mild
degenerative changes. (Id.). Additionally, the ALJ noted that Stancavage's physical
examinations revealed good range of motion, slight crepitus and tenderness, no

48

swelling, and no instability. (Tr. 31). The ALJ further cited Stancavage's minimal treatment, explaining that Stancavage received medication management and periodic injections for her knees to manage her pain. (Id.).

Accordingly, the Court finds that the ALJ fulfilled her duty in considering Stancavage's symptom allegations and weighed them against the entire medical record. In doing so, the ALJ provided a thorough explanation for affording limiting weight to Stancavage's symptom allegations, and thus her credibility. This is all that the law requires, and all that a claimant like Stancavage can demand in a disability proceeding. It appears that Stancavage is requesting that this Court re-weigh the evidence, which this court cannot do.  Rutherford, 399 F.3d at 552 ("In the process of reviewing the record for substantial evidence, we may not 'weigh the evidence or substitute our own conclusions for those of the fact-finder.'" (quoting Williams, 970 F.2d at 1182)).  Because the Court cannot re-weigh the evidence, we find the ALJ has not erred in her consideration of Stancavage's symptom allegations.

## 5. **Substantial Evidence Supports the ALJ's Step Five Evaluation**

Stancavage's last contention challenges the ALJ's step five evaluation. Specifically, Stancavage argues that the ALJ's hypothetical question(s) to the vocational expert, failed to incorporate all of her credibly established limitations. (Doc. 10 p. 18). Stancavage argues:

49

> In the instant case, the ALJ's hypothetical omitted the credibly
> established limitations assessed by Dr. Kricher (R. 87- 88). When
> counsel included some of the most significant limitations assessed by
> Dr. Kricher, the VE testified that all work would be precluded by any
> one of them (R. 89-90). Moreover, the ALJ failed to include all of her
> own findings in the hypothetical on which she relied. The ALJ found
> that Plaintiff had moderate limitations in adapting and managing herself
> (R. 29), but failed to convey the effect of those limitations on her ability
> to adapt to changes in a workplace in the hypothetical (R. 87-88). This
> was reversible error. See Ramirez, 372 F.3d at 552-55 (ALJ failed to
> convey to VE her own finding of moderate limitations in concentration,
> persistence or pace).

(Doc. 10 p. 18). Stancavage avers that there is no substantial evidence of work available given Stancavage's credibly established limitations. (Doc. 10 p. 18). Stancavage asserts that the ALJ based her denial of benefits on the vocational expert's answer to her defective hypothetical, and failed to carry her burden of production at step five of the sequential evaluation. (Doc. 10 p. 19). Thus, the ALJ's decision should be reversed. (Id.).

In response, the Commissioner argues that the ALJ did not accept the vocational expert's testimony based upon assumed limitations not supported by the record, i.e. Dr. Kricher's limitations. (Doc. 15 p. 13). The Commissioner further contends that the ALJ was not required to include moderate limitations in the RFC and hypothetical question to the vocational expert. (Doc. 15 p. 14). Specifically, the Commissioner avers:

> The ALJ's finding of moderate limitations refers to the paragraph B

50

criteria of the Listings. 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00A (explaining that each listing, except 12.04 and 12.06, consists of a statement describing the disorder addressed by the listing, identified as the paragraph A criteria, and a set of impairment-related functional limitations, identified as the paragraph B criteria). An assessment of the paragraph B criteria of the listings is an evaluation at step three of the sequential evaluation process. 20 C.F.R. § 404.1520(a)(4)(iii) (stating that at the third step of the sequential evaluation process, we consider the severity of your impairment under the listings). As such, it is not a residual functional capacity assessment, which occurs at step four of the sequential evaluation process. 20 C.F.R. § 404.1520(a)(4)(iv). The ALJ, therefore, appropriately did not include a limitation to moderate difficulties in interacting with others and adapting or managing oneself in her residual functional capacity determination. See Hux v. Astrue, No. 11-1306, 2012 WL 4498845, at *5-6 (W.D. Pa. Aug. 27, 2012) (explaining that the findings under the four broad functional areas are only relevant for the purpose of determining whether the ALJ needs to make a residual functional capacity assessment). Because the hypothetical question to the VE fairly set forth all of Plaintiff's limitations, the VE's testimony supports the ALJ's conclusion that Plaintiff was not disabled.

(Doc. 15 p. 14-15).

The Court of Appeals has ruled that the ALJ—not treating or examining physicians or State agency consultants—must make the ultimate disability and RFC determinations. Chandler, 667 F.3d at 361. RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s).'" Burnett, 220 F.3d at 121 (3d Dept 2000) (quoting Hartranft v. Apfel, 181 F.3d 358, 359(3d Cir. 1999)). It reflects the *most* that an individual can still do, despite his or her limitations, and is used at steps four and five to evaluate

the claimant's case. 20 C.F.R. §§ 404.1520, 404.1545; SSR 96-8P, 1996 WL 374184 at *2. In assessing the RFC, the ALJ must consider all the evidence of the record and, regardless of its source, "evaluate every medical opinion . . . receive[d]." Burnett, 220 F.3d at 121 (internal citations omitted). The Court's "review of the ALJ's assessment of the [claimant]'s RFC is deferential," and the "RFC assessment will not be set aside if it is supported by substantial evidence." Black v. Berryhill, No. 16-1768, 2018 WL 4189661 at *3 (M.D. Pa. Apr. 13, 2018); see also Martin v. Comm'r of Soc. Sec., 547 F. App'x 153, 160 (3d Cir. 2013) ("We examine the ALJ's conclusions as to a claimant's RFC with the deference required of the substantial evidence standard of review." (internal quotation marks omitted)).

At step five of the sequential evaluation process, the ALJ considers the claimant's age, education, and work experience to determine whether the claimant can make the adjustment to other work by posing a hypothetical question(s) to the vocational expert. Chrupcala v. Heckler, 829 F.2d 1269, 176 (3d Cir. 1987); see also Rutherford, 399 F.3d at 554; Ramirez, 372 F.3d at 552-55; Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir. 1984). As correctly stated by Stancavage, "a hypothetical question posed to the vocational expert must reflect all of the claimant's impairments that are supported by the record; otherwise the question is deficient and the [vocational] expert's answer to it cannot be considered substantial evidence.

Chrupcala, 829 F.2d at 1276; see also Rutherford, 399 F.3d at 554; Ramirez, 372

F.3d at 552-55; Podedworny,745 F.2d at 218. The ALJ, however, is not required to

submit to the vocational expert every impairment alleged by a claimant. Rutherford,

399 F.3d at 554. "[S]uch references to 'all impairments' encompass only those that

are medically established." (Id.). Thus, the question posed to the ALJ must

accurately convey to the vocational expert all of a claimant's credibly established

limitations. Id. (quoting Plummer, 186 F.3d at 431).

Applying the above standard, the Court is not persuaded by Stancavage's

argument as to this issue. Stancavage argues that the ALJ's hypothetical question(s)

posed to the vocational expert, omitted the credibly established limitations assessed

by Dr. Kricher. (Doc. 10 p. 18). However, the ALJ was not required to include all of

the limitations assessed by Dr. Kricher's, she was only required to include all of

Stancavage's credibly established limitations. See Rutherford, 399 F.3d at 554;

Plummer, 186 F.3d at 431. Further, while Stancavage contends that the ALJ omitted

Dr. Kricher's limitations in the hypothetical question posited to the vocational

expert, Stancavage fails to identify the limitations omitted by the ALJ and fails to

establish that any additional limitations should have been included.

Additionally, Stancavage argues that the ALJ failed to include all of her own

findings, including her determination that Stancavage had moderate limitations in

the paragraph B category of adapting and managing oneself. (Doc. 10 p. 18).
Specifically, Stancavage alleges that the ALJ failed to convey the effect of those
limitations on her ability to adapt to changes in a workplace. (Id.). We find
Stancavage's contentions on this score are unavailing. The ALJ did consider
Stancavage's moderate limitations in the category of adapting and managing oneself
in her hypothetical question posed to the vocational expert. For example, the ALJ
posited the following question to the vocational expert:

> Assume . . . an individual of this claimant's age, education, and past
> work history. Further assume the individual is capable of performing a
> range of sedentary, unskilled work that does not involve detailed
> instructions. Confined to routine, repetitive tasks with no assembly line
> production and no more than occasional contact with the public and
> coworkers.

While the hypothetical question posed to the vocational expert must account for all
of a claimant's impairments, "those findings need only be "adequately conveyed" in
the ALJ's statement of the limitation, not recited verbatim. Hess v. Commissioner
Social Security, 931 F.3d 198, 208-10 (3d Cir. 2019). Moreover, the ALJ accounted
for Stancavage's moderate limitations in the category of adapting and managing
oneself in crafting the RFC. For example, after careful consideration of the record,
the ALJ concluded:

> [Stancavage] had the [RFC] to perform a range of sedentary unskilled
> work that did not involve detailed instructions. She was confined to

routine, receptive tasks with no assembly line production and no more than occasional contact with the public and co-workers.

(Tr. 31). Lastly, even assuming that the ALJ did not address Stancavage's moderate limitations in the category of adapting and managing oneself in the hypothetical question posited to the vocational expert, any error is harmless. The Court of Appeals has held:

> [The] limitations identified in the "paragraph B" and "paragraph C" criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process. The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments, and summarized on the PRTF.

Ramirez, 372 F.3d at 551-52.

Because we find that the ALJ's hypothetical question posited to the vocational expert, adequately set forth all of Stancavage's credibly established limitations, we find that the ALJ committed no error as to this issue.

In closing, the ALJ's assessment of the evidence in this case complied with the dictates of the law and was supported by substantial evidence. This is all that the law requires, and all that a claimant can demand in a disability proceeding. Thus, notwithstanding the argument that this evidence might have been viewed in a way which would have also supported a different finding, we are obliged to affirm this

ruling once we find that it is "supported by substantial evidence, 'even [where] this court acting *de novo* might have reached a different conclusion.' " <u>Monsour Med. Ctr. v. Heckler</u>, 806 F.2d 1185, 1190–91 (3d Cir. 1986) (quoting <u>Hunter Douglas, Inc. v. NLRB</u>, 804 F.2d 808, 812 (3d Cir. 1986)). Accordingly, under the deferential standard of review that applies to appeals of Social Security disability determinations, we find that substantial evidence supported the ALJ's evaluation of this case.

## IV.   <u>Conclusion</u>

Accordingly, for the foregoing reasons, IT IS ORDERED that the final decision of the Commissioner denying these claims is AFFIRMED.

An appropriate order follows.

/s/ *Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

Submitted this 29th day of June, 2020